## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**BARBARA ORBAN**
     **Plaintiff,**

**v.**                                  **CASE NO.: 8:04-cv-1904-T-23MAP**

**CITY OF TAMPA, FLORIDA,**
     **Defendant.**
_____/

## FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL
## (INJUNCTIVE AND DECLARATORY RELIEF SOUGHT)

Plaintiff, Barbara Orban, Ph.D. (hereinafter "Dr. Orban"), sues the Defendant, City of Tampa, and states as follows:

## GENERAL ALLEGATIONS

1.     This action is brought pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343 and 42 U.S.C. § 1983 for damages and declaratory and injunctive relief.

2.     Dr. Orban is and was at all material times a resident of the City of Tampa, Florida.

3.     Dr. Orban is, and at the time of the initial incident on March 27, 2000 was a professor in the College of Public Health at the University of South Florida.

4.     At all relevant times, Tampa police officers David Duncan ("Duncan") and Edward Bowden ("Bowden") were employed as police officers by the City of Tampa acting within the course and scope of their employment. At all material times, Officers Duncan and Bowden acted under color of law and under order and pretense of the

statutes, ordinances, regulations, customs, and usages of the State of Florida and the City of Tampa, as well as the policies, practices, means and accepted methods of the City of Tampa and its Police Department.

5.      The Defendant, City of Tampa, is a municipal corporation.

## COMMON ALLEGATIONS

### The Citation and Crash Reports

6.      On Monday, March 27, 2000, Dr. Orban left work at the University of South Florida in her automobile and headed to her house in South Tampa.

7.      The weather was cloudy and wet.

8.      Dr. Orban was driving slowly south on South Howard Avenue in South Tampa, at what she believed was a reasonable distance behind an SUV.   While the speed limit was 30 miles per hour, she was going approximately 15 miles per hour.   She was aware of the weather, road conditions and the traffic moving along the road.   Without signaling, the SUV suddenly turned left in front of stopped traffic.   After the SUV turned, Dr. Orban saw a stopped 1998 BMW driven by Matthew Collins ("Mr. Collins") behind other cars backed up from one intersection and nearly to the intersection where the SUV abruptly turned.   Dr. Orban immediately applied her brakes which due to rain and oil deposits did not immediately engage the road.   Dr. Orban's anti-lock brakes eventually engaged, but too late  and her car bumped into the rear end of the BMW. The vehicle following Dr. Orban swerved into the vacant lane of oncoming traffic to avoid hitting Dr. Orban's car in the rear.   There were no physical injuries to either Dr. Orban or Mr. Collins.  The physical damage to both cars was minor.  Dr. Orban's car dented the license plate and left some car paint on the bumper of the BMW.

9.      Fla. Stat. §316.065, requires drivers to call the police department "*immediately by the quickest means of communication*" if the damage to any vehicle is "*an apparent amount of at least $500*". Failure to contact the police under these circumstances is punishable by a non-criminal traffic infraction. Mr. Collins initially stated an expectation for a large insurance settlement.

10.      Shortly after Dr. Orban called the police at 6:20 p.m. from her car phone. Tampa Police Officers Bowden and Duncan arrived.  Officer Duncan was in training and Officer Bowden was his supervisor.  Officer Bowden questioned Dr. Orban.  Eventually a citation was issued.  See Exhibit A.  Officer Duncan questioned Mr. Collins and wrote the short-form traffic crash report. See Exhibit B.  In addition, Officer Duncan wrote a long-form traffic crash report.   See Exhibit C.  Neither Tampa Police Officer had observed the traffic accident.

11.      Dr. Orban was detained and unable to leave for approximately 45 minutes to an hour.  After having conducted his investigation and having interviewed Dr. Orban and Mr. Collins, Officer Bowden concluded and told Dr. Orban that there was no violation of any traffic laws.  He explained Florida does not have a citation for "causing an accident."   Nevertheless, he informed Dr. Orban that his Tampa Police Department supervisor required him to issue her a traffic citation due to her "characteristics."  Officer Bowden explained that the citations issued for rear-end collisions are "following too closely" and "careless driving".  He stated the citation would be written for "following too closely," but then explained that "following too closely" was not applicable since it required both cars to be in motion at the same time.  Bowden also said he would not cite her for "careless driving" since that offense required some improper driving action on her

part such as speeding or improper lane change, which he concluded had not occurred. Officer Bowden stated that Dr. Orban was driving at a low rate of speed, had stayed in her lane, and a careless action was not identified.  Officer Bowden then discussed the insurance implications of the two alternative citations and pointed out that insurance companies viewed careless driving more adversely.  The officers returned to their police vehicle.

12.     The detention of Dr. Orban was not reasonable once the investigation concluded she did not violate a traffic law.  Nevertheless Dr Orban was detained by words and show of authority.  The officers took documents including her driver's license, registration and insurance card during the period of detention.  Officers Bowden and Duncan used the unreasonable period of detention, *inter alia,* to:  contact their supervisor; write the citation, a short-form crash report that was provided to Mr. Collins and Dr. Orban, and a long-form crash report that would be submitted to Court and to the Department of Highway Safety and Motor Vehicles as the permanent record of the accident; and address  Dr. Orban.   Dr. Orban was not free to leave during this time.

13.     Fla. Stat. §318.14 requires drivers to accept and sign a traffic citation and provides that: "*Any person who willfully refuses to accept and sign a summons is guilty of a misdemeanor of the second degree.*" Fla. Stat. § 316.061 and .062 require people involved in a crash to give information to police officers upon request.   Fla. Stat. § 316.0723 makes it unlawful to willfully fail or refuse to comply with any lawful order or direction of a law enforcement officer.   Under Fla. Stat. § 843.02 an individual may be guilty of unlawfully obstructing an officer of he or she flees while knowing of the officer's intent to detain him or her.  Fla. Stat. § 316.1935 makes it a crime to willfully

flee or attempt to elude a law enforcement officer having been ordered to stop or once having stopped.

14.     When Officer Duncan handed her the citation, Officer Bowden advised Dr. Orban that the citation was written for following too closely.  When Dr. Orban initially said she did not want to sign the citation, since Officer Bowden had told her she did not violate a traffic law, Officer Bowden told her if she did not, things would get much, much worse.  The citation actually charged Dr. Orban with careless driving pursuant to 316.1925 of the Florida Statutes.  The citation failed to provide documentation of a careless driving action. Officer Bowden also advised Dr. Orban to request a traffic hearing rather than pay the fine.

15.     Florida Statute 316.645 requires a police officer to conduct a "personal investigation" and to have "reasonable and probable grounds" to believe an offense was committed in order to write a citation following a crash investigation.

16.     Officer Bowden conducted a personal investigation and did not identify reasonable and probable grounds for a citation.  In contrast, Officer Duncan failed to conduct a reasonable investigation of the accident.  Although ascertaining that neither driver was injured, he asked no questions of Dr. Orban about the accident and did not conduct an independent reasonable investigation into why the minor accident occurred. Officer Duncan admitted in later conversations with Dr. Orban that he was not listening to Officer Bowden during Officer Bowden's conversations with Dr. Orban.  Officers Bowden and Duncan did not have reasonable and probable grounds to issue the citation based on all the circumstances, including the facts showing it was an unavoidable accident, the admission to Dr. Orban she had not committed a traffic violation, their

failure to document a careless driving action on either the citation or the four page long-form crash report and, as discussed below, the false and omitted information on these documents..  They also did not have reasonable and probable grounds to issue a citation for following too closely for the same reasons and the fact they had no evidence both cars were moving.

17.     Some time after March 27, 2000, Dr. Orban discovered, contrary to what she had been told, that the citation was written for "Careless Driving."  As noted, a specific careless action is not identified or written in the remarks section of the citation.  The only documentation on the citation that attempts to support the careless driving charge is that of an injury.  The citation block was checked "Yes" that an "Injury To Another" had occurred when none had.  Also, the citation block was checked that "Personal Checks Are Not Accepted."   The Tampa Police Department does not require or have a policy on this stipulation.  The City of Tampa receives a percentage of the fine collected as a result of the citation, and the Tampa police pension fund receives 0.85 percent of any related automobile insurance increase.  The additional pension fund collections are used to reduce police employee and city contribution rates to the pension fund and to provide "extra" police pension benefits as required by law.

18.     In addition to the citation, Officer Duncan handed Dr. Orban a completed report which can be used for several different purposes.  Officer Duncan checked the box titled "Driver Exchange of Information."  This form is also the "Law Enforcement Short Form Report" and provided all information required by the State.

19.     Unbeknownst to Dr. Orban, the officers had also prepared the four page traffic crash report that was documented on the "long form."   This four page report

("crash report") contained numerous erroneous entries.  The crash report was intended to be used as evidence against Dr. Orban at any hearing on her citation, but Dr. Orban was unaware that it existed for over a year.  It was also used by the insurance company to make decisions about fault and premium increases.  The crash report is on file with the Florida Department of Highway Safety and Motor Vehicles as a permanent record of the accident and accessible for review by any insurance company that assesses the risk associated with Dr. Orban for purposes of selling insurance.

20.     Although Officer Bowden had told Dr. Orban that he would not attend the hearing, he failed to mention that he would submit the false four page crash report to the hearing.  Dr. Orban did not obtain this crash report until receiving a March, 2001 letter from Internal Affairs Captain Marks.  In the meantime the report was used as evidence against her at an August 30, 2000 hearing on her citation.

21.     In April 2001, Dr. Orban obtained a copy of the crash report.  In addition to the injury misrepresentation on the citation, the crash report contained many erroneous and false statements about the accident that tended to improperly support the citation written, including the following:

i.     Air bags are reported to have been "in use" on both cars.  In fact, the air bags were not deployed in either car.

ii.     Dr. Orban's vehicle movement is listed as straight ahead and not as slowing.  In fact, Dr. Orban's vehicle was almost stopped when she bumped the other vehicle and there had been a period of slowing.  In fact, Mr. Collins had reported that he heard braking.

iii.     The weather is incorrectly reported as clear and the road surface as dry.  In fact, the rain had just concluded and the road surface was wet at the time of the accident, and the road was still wet when the officers arrived following the first significant rain of many months.

iv.     The report incorrectly states in five separate entries that the accident occurred on MacDill Avenue.  It actually occurred on South Howard Avenue.

v.     The crash is reported to have occurred at 6:30 p.m., when in fact, it occurred at approximately 6:10 p.m.   The time is material since the rain concluded around 6:00 p.m. and the officers did not arrive until 6:45 p.m.  The call to the police department was made at 6:20 p.m.  The officers did not inquire about the time of the accident.

vi.     In addition, the narrative is generic and states that Dr. Orban "failed to observe vehicle #2 in time."  It does not identify a careless action (e.g. incorrect speed, improper lane change, looking elsewhere) which Officer Bowden said was required for careless driving and the absence of which was the reason given by Officer Bowden for the inappropriateness of a careless driving citation.

vii.     The narrative fails to report the mitigating factors that Dr. Orban reported to Office Bowden including that Dr. Orban could not view and did not know vehicle #2 was stopped due to a large SUV in front of her that had abruptly turned in front of stopped traffic (probably to avoid hitting the vehicle).  The report also failed to report the intersection did not have a left turn lane which would have decreased the likelihood of the accident.   The narrative and diagram

in the report also exclude mention of the SUV which had blocked her view.  The narrative also excludes Dr. Orban's statement that her vehicle's brakes did not immediately engage due to a rain-road oil combination as well as her complaint that Howard Avenue did not have a shoulder or parking lane.  In fact, the city of Tampa reports this roadway segment has an "F" rating, which is the worst rating reflecting that traffic volume significantly exceeds road capacity.

  viii. Section 316.1925 of the Florida Statutes states that careless driving is a failure to drive "in a careful and prudent manner, having regard for the width, grade, curves, corners, traffic, and all other attendant circumstances, as not to endanger the life, limb or property of any person."  In a subsequent discussion with Officer Bowden on or about April 15, 2000, Officer Bowden referred Dr. Orban to this section and suggested she bring it with her to defend herself at a traffic hearing.  A lack of regard for the "width, grade, curves, corners, traffic or other attendant circumstances" is not identified in the crash report.

  ix. The "site location" is incorrectly reported as "not at intersection" and incorrectly reports the distance from the intersection.  Moreover, the report did not and should have stated the accident was "Influenced by Intersection" since Mr. Collins was stopped in traffic from an intersection and Dr. Orban could not see the stopped car until the SUV in front of her turned left at an intersection.  The officers did not ask either driver to show them where the minor accident occurred.

  x. The long form traffic crash report was used.  The long form is to be used only in cases of death or bodily injury, or when a wrecker is needed to

remove the vehicles.   A short form should have been utilized.   Florida laws require that the correct form must be used, which did not occur.

xi.      The crash report fails to identify that the property damage to Dr. Orban's car as limited to right side of her bumper, reflecting that she did swerve to the left in an attempt to avoid hitting the other car.

22.      On March 27, 2000, Officer Bowden and his supervisor allowed the issuance of a traffic citation without reasonable and probable grounds, and permitted in-training Officer Duncan to use the incorrect crash report form and report erroneous entries that misrepresented the severity and circumstances of the minor crash.

### The Policies, Practices and Customs

23.      The Tampa Police Department has policies, practices and customs designed to increase insurance premium tax revenues that accrue to the Tampa police pension fund.  The tax generated from increased insurance premiums reduces employee contributions to the pension plan and increases police officer's take-home income.  In addition, the City of Tampa contributions to the police pension fund are similarly reduced when officers contribute at a lower rate since the city contribution rate is determined by employee contributions.  In order to increase insurance premium tax revenues, the Tampa Police Department has a policy, practice and custom of issuing traffic citations in crash cases where reasonable investigation has not occurred or where such investigation has disclosed that either no citation would be appropriate or that a less severe citation would be the appropriate citation.  Entries on reports are erroneously made or falsified to support these citations.  New recruits are taught that they are expected to write a traffic citation following every traffic crash investigation.  They are also taught that they should

come up with a rationale to justify their citation and that they will not need to testify in front of a court about their rationale for the citation. If, after investigation of a crash, an officer believes issuance of a citation is inappropriate, he or she must still obtain the authorization of a supervisor not to write a citation. Officers who do not follow the directions of their supervisors can be disciplined through sanctions that include termination. A *de facto* quota system exists under which the job performance of officers is measured by how many traffic citations they issue. This *de facto* quota system is enforced through the appraisal system. Tampa police officers are rated down if they do not write enough traffic citations and are encouraged to find out the number written by other officers who get favorable ratings so the Department can avoid having written quotas for such citations.

24.     Police officers and administrators and the city benefit from a tax on automobile insurance premiums which accrues to the Tampa police pension fund. The Florida Department of Retirement Services ("FRS") identifies Tampa as the only municipality with a variable employee contribution rate to the police pension fund. All other municipalities identify the employee contribution rate of police officers as a fixed percentage. FRS reports the Tampa police employee contribution rate as 6 to 25 percent. However, in one recent year, contribution rates were actually been less than two percent. Regardless, as premium tax revenues increase, the Tampa police employee contribution rate to the pension plan can and has decreased.

25.     Consistent with the training recruits receive, the procedure for doing this is described in Tampa police policy **634 Traffic Citations** concerning subpoenas resulting from traffic citations:

2.   *Upon receipt of a traffic court subpoena, officers will refer to the Accountability Record and determine if the case is a civil infraction from a traffic crash, which the officer did not witness.*

  a.  *If so, the officer will not have to appear in court through an agreement with the traffic judges.*

  b.  *In order to be relieved of the responsibility of appearing in court, officers must obtain a copy of the crash report and a pre-printed memo available in the District Administrative CSO's offices.*

  *The Memo must be completed, attached to the report copy and the subpoena, and submitted to the officer's supervisor. The supervisor will ensure that the memo will arrive in the CSO's office at least two week days prior to the court date, Sunday, Saturday, and holidays excluded.  Supervisors of divisions other than a Uniform District will forward them to the District Administrative CSO within the prescribed time limits.*

  *1) Upon receipt of subpoenas delivered in this fashion, the Administrative CSO's will deliver them to the deputy clerk of violations who will place them in the applicable court file.*

  c.  *Should an officer fail to follow this procedure in a timely manner, he or she must appear in person in court.*

26.   The Tampa Police Department policy is structured to prevent a driver, such as Dr. Orban, from requiring officers to appear in Court if the officer did not witness the crash but wrote a citation and crash report.  Tampa Police Department policy permits officers to respond to related subpoenas by submitting their crash report to Court.  As such, it was not possible for Dr. Orban to confront Officers Bowden or Duncan in Court and require them to explain facts and circumstances regarding their observations and conclusions, such as the weather, injury, and air bag deployment.

27.   The foregoing policies, practices and customs are designed to increase the number and severity of citations written after traffic crashes which has the effect of

raising insurance premiums and by operation of law increasing the amount of money received by the police pension fund, decreasing the amount individual police officers have to contribute to their pension fund and increasing the take home pay of officers, which also decreases the City of Tampa's contributions.  Florida statutes require that increases in premium tax collections must be used to provide "extra" police pension benefits.  The Tampa policies, practices and customs also encourage, foster and protect erroneous or false entries on traffic citations and crash reports to justify inappropriate citations; deny individuals the ability to confront the officers; and permeate the prosecution and resolution of a citation with distinct financial incentives.  The insurance companies have access to traffic crash reports, and use them to readjust the ratings for insured drivers.  When the insurance premiums are increased, the gross amount of the excise tax on the premiums increases and more revenue is generated to the police pension fund.  The Tampa City Police force has a financial incentive to write traffic citations for every situation, including those in which a traffic ordinance was not violated, for which reasonable and probable grounds to issue a citation do not exist or for which only a less severe citation is appropriate.  This policy has been put into effect by the Tampa City Police.

28.     Fla. Stat. §185.07 and 185.08 *et seq* requires a 0.85-percent excise tax on casualty insurance premiums from policies issued in a municipality with the funds accruing to the municipality's police pension fund.  Fla. Stat. §185.35  *et seq* stipulate that premium tax revenues "shall in all cases be used in its entirety to provide extra benefits to police officers," and that any amount exceeding the premium tax revenues received for calendar year 1997 "shall be used to provide extra benefits."  Thus, the

Tampa police have a direct financial incentive to increase insurance rates after 1997 in order to receive "extra benefits."  Following 1999, Tampa police administrators have systematically worked to increase the insurance rates of Tampa drivers.  Since 1999, Tampa police officers and administrators have benefited from increased premium tax revenues through reduced employee contribution rates, and more recently through a substantial increase in the pension benefit.

29.     Accident and citation entries on a driving record, as well as crash reports, are used in insurance underwriting.  Automobile insurance premiums are in part determined by accidents and citations.  The Tampa police reporting of crashes and issuing citations when traffic laws were not violated, as in Dr. Orban's accident, are structured to increase automobile insurance premiums in multiple ways.

30.     In addition, insurance companies categorize careless driving as a more significant citation since it is categorized with driving under the influence, reckless driving, or having a driver's license suspended or revoked.  When Dr. Orban attempted to increase umbrella liability coverage, she had to respond to a question about whether she had received a citation for any of careless driving, DUI, reckless driving, or having a license suspended or revoked.  As a consequence of having to answer this question affirmatively, despite the citation being dismissed, she was ineligible to purchase the insurance.

## The Hearing

31.     The Hillsborough County Traffic Court set a hearing on the careless driving citation for August 30, 2000.  Officers Duncan and Bowden were not present. Mr. Collins testified as well as Dr. Orban.  After having heard Dr. Orban's testimony, the

court read some papers which included the four page crash report.  The court stated Dr. Orban's version of the facts was contradicted by the police and found Dr. Orban guilty, withheld adjudication, and assessed her $100.00 in court fees.

32.     Dr. Orban did not know a four page long-form crash report was written, did not have the crash report at the hearing, did not know the crash report had been submitted to the hearing, and was not provided a copy at that time.

33.     Dr. Orban appeared untruthful in Court due to the extensive false entries on the citation and crash report that were documented by Officers Bowden and Duncan and submitted to the hearing by Officer Bowden.

### Remedial Efforts

34.     Not satisfied with the outcome of the hearing Dr. Orban contacted Internal Affairs on or about September 1, 2000 and spoke with Internal Affairs Detective Murray. Dr. Orban explained the circumstances and asked about how to file a complaint.  Det. Murray told Dr. Orban the officers performed consistent with Tampa police policy and further said officers can do whatever they want to do.  He said Tampa police would not investigate her complaint even if she provided it in writing.

34.     With the intent of appealing the verdict in traffic court, Dr. Orban subsequently made a written request to Police Chief Holder to have Officer Bowden provide his statements to her in writing.   The police chief and his aide, Sgt. Bennett, denied access to Officer Bowden's statements.  They did not provide the four page long-form report, which is the officers' official statement and conclusions.   They provided only the first page of the long-form report, which Dr. Orban concluded was the entire report.  The page was somewhat similar to the short-form crash report.  The police chief

and his aide forwarded this page to demonstrate their concurrence that an injury did not occur.  However, they did not send the other three report pages that explain the accident circumstances.

35.     On December 23, 2000, Dr. Orban filed a formal written complaint with the Tampa Police Internal Affairs Department regarding Officer Duncan, Officer Bowden, their supervisor, and the inappropriate issuance of a ticket in a case where there were no grounds to issue a ticket.   Consistent with the Tampa Police Departments policies, practices and customs, Tampa police administrators and the City Attorney's office acted to sustain the Court verdict and the false crash report, which sustains the higher insurance premiums.

36.     Dr. David Orban, Plaintiff's husband, contacted Internal Affairs when a response was not received to the written complaint.  Det. Murray informed David Orban that the complaint would not be investigated because the police department did not want the citation dismissed.   Subsequently, Barbara Orban contacted Det. Murray.   Det. Murray informed her that Tampa police officers are expected to write a ticket if called to a crash even if traffic law violation did not occur.  He also stated that Tampa police officers are permitted to submit false information to court.  Det. Murray further stated the officers could fabricate entries and reporting and that she would find no one who will intervene on her behalf.  He refused to document these statements, expressing concern that Dr. Orban would use them to have the citation dismissed.

37.     Dr. Orban made a written request to Mayor Greco for intervention on the complaint, recounting her discussion with Det. Murray, which the mayor's staff

forwarded to the police chief's office.  Police chief aide, Sgt. John Bennett, advised the Mayor's staff  by e-mail to not respond.

38.      Florida Statutes 112.533, Tampa Police Policy – 651 Internal Affairs, and the Commission on Accreditation of Law Enforcement Agencies ("CALEA") each require an investigation of complaints received about law enforcement officers. When Dr. Orban requested Tampa police policies in order to file a complaint with CALEA, Internal Affairs Captain Jill Marks responded in correspondence dated March 28, 2001 which reaffirmed Det. Murray's previous statements to Dr. Orban that she had "no complaint."

39.      Dr. Orban requested the crash report in April 2001.  With advice from a Florida Department of Law Enforcement agent, Dr. Orban subsequently filed a complaint with CALEA, the Tampa Police accrediting agency.  Florida Statute 943.125 requires accreditation of Florida law enforcement agencies.  CALEA requires that all complaints against a police agency or its employees must be investigated.

40.      Dr. Orban reported to CALEA that the Tampa police refused to investigate her complaint of discrimination, false reporting, and submitting false information to court.  CALEA conducted an accreditation site visit in May 2001.  Tampa police purportedly provided documentation to CALEA that the complaint was investigated and the officers disciplined.  However, public records indicate that there was no investigation and that discipline did not occur.

41.      With advice from the Florida Department of Law Enforcement agent, Dr. Orban filed a second written complaint to Tampa Police Internal Affairs Captain Marks on May 4, 2001.  It restated the complaint in the context of police department policies,

and identified failures to abide by their own policies.  In addition, the letter requests the legal basis for Det. Murray's claim that TPD requires officers to write citations when officers are called for assistance in traffic accidents, even if a violation of law has not occurred.  Captain Marks did not investigate the complaint or respond to the questions.

42.     Dr. David Orban, Plaintiff's husband, requested intervention from Tampa City Councilman, Bob Buckhorn, who was also the City Council's Public Safety Liaison. Mr. Buckhorn responded that he contacted Sgt. Bennett and was not hopeful.  He did not respond further.

43.     Dr. Orban contacted the Florida Department of Highway Safety and Motor Vehicles to inquire about an alternative means to amend the false crash report.  A Florida Highway Patrol (FHP) captain in Tallahassee responded by e-mail and advised her to contact the Tampa police chief to obtain corrections.

44.     All potential avenues of recourse regarding the false reporting refer back to the Tampa Police Chief's office, in particular Sgt. Bennett.

### Favorable Termination

45.     In August 2001, Dr. Orban filed a Motion for Reconsideration of the careless driving verdict with the Tampa Traffic Violations Bureau based on the false entries in the police report and the failure to investigate.

46.     Evidence of the false entries was presented at a hearing on said motion and the court reversed the prior ruling and reopened the case.  On January 9, 2002, the traffic court held another hearing, and the case was dismissed.  For purposes of malicious prosecution that dismissal is a favorable termination.

48.   Dr. Orban had Officer Bowden subpoenaed to the January 9, 2002 hearing.  This would allow him to explain the citation and crash report in front of a judge. Bowden did not attend.  The Tampa Police Department did not request a continuance. Officer Bowden was not investigated or sanctioned for his failure to appear at the hearing.

### **Direct and Indirect Costs and Expenses and Additional Remedial Efforts**

49.   By reason of the conduct of the Defendant Dr. Orban was required to employ legal counsel and pay reasonable costs and fees.  In addition to the costs and attorney's fees generated by Dr. Orban to clear her record,  she suffered a financial loss with respect to her insurance coverage.  -Moreover, the crash report that is referred to on Dr. Orban's driving record, would be used by any insurance company that Dr. Orban contacted in an attempt to obtain a lower insurance rate.  It was used in insurance underwriting in 2004.

50.   After the citation was dismissed, the Tampa City Attorney was requested to correct the false crash report entries.  This would allow Dr. Orban to purchase insurance from another company without being penalized by the false crash report entries referenced on her driving record.  An Assistant City Attorney responded that the crash report is inaccurate, but refused to make corrections other than the street name change. He attributed errors to Officer Duncan's inexperience and advised that "material disagreements may be resolved in court."  However, the Department of Highway Safety and Motor Vehicles report that even the purported street name amendment, which was written by the Tampa police public records officer, was not received by them.

51.     The false Tampa police crash report is still on file.  It is a public record and can still be accessed by insurance companies.  The City of Tampa has continued to refuse to make material changes to the crash report despite acknowledging the report is inaccurate and has errors.   The Tampa City Attorney's office knew the officers provided false information to the Court and to the Kemper-Lumberman's Mutual insurance and that the police pension fund benefited from the errors.  They refused to make changes. The Tampa city attorney's office acted to sustain the premium increase by refusing to make corrections even after acknowledging the information was incorrect.  As such, they attempted to prevent Dr. Orban from remedying the false charge.

52.     A legal process to correct a false police crash report does not exist when a police department refuses to correct false entries.  Consequently, Dr. Orban's crash report will remain as a false permanent record.

### Selective Enforcement and Likelihood of Impact by Policy

53.     A Tampa police supervisor informed Dr. Orban that Tampa police training teaches new recruits that they are expected to write a traffic citation following a traffic crash investigation.  In addition, he said Tampa police training teaches officers that they will not need to testify in front of a judge at a hearing about their rationale for such a citation because the officer can send the crash report rather than appear in person.  This policy helps transfer police pension contribution to the public and the Tampa Police Department selectively enforces traffic investigations to accomplish that result.

54.     Dr. Orban moved to Tampa in July 1997.   Three times she incurred expense from false, inaccurate and/or incomplete Tampa police reporting on citations and crash reports.  In 1999, Dr. Orban received a false traffic citation from Tampa police

officer Maxwell.  After discrediting the officer's statements using objective information, Cpl. Niemi explained to David and Barbara Orban that the reason the officer falsified the citation was due to significant pressure from the city on the police department to "achieve revenue targets".   The officer was terminated.

55.     In April, 2003, Dr. Orban's 17 year old son, Eric Orban, was involved in a traffic accident when another driver ran a red light.  Both cars were total losses.  Tampa Officer Steven Cragg investigated the crash.  Dr. Orban arrived at the time Officer Cragg was writing his report.  She expressed her concern that he would falsify the crash report and explained her past experience.  Officer Cragg said three witnesses saw the other driver run the red light so his report would be accurate.  Officer Cragg asked Dr. Orban to explain what she meant by "falsifying crash reports."  Orban explained the Tampa Police Department's unwritten policy that requires officers to write traffic citations following accidents even if a traffic law violation did not occur or if the officer does not know who violated a traffic law.  By writing such a citation, officers are then compelled to fabricate entries on the crash report to support writing the citation.  Officer Cragg affirmed this is Tampa police policy but responded that officers do not regard this as "falsifying" reporting because they are ordered to do so by supervisors.  He said that since officers are following orders, it is not false reporting.  Officer Cragg then recounted that he once investigated a mid-intersection crash with significant property damage.  He reported being unable to determine who caused the crash, but his supervisor nonetheless required him to issue a traffic citation to one of the drivers.  He expressed discomfort in selecting a driver as causing a major accident when he in fact did not know who did so.

56.     Dr. Orban has identified several other people who have had similar experiences with Tampa police officers fabricating or omitting information about a crash to support writing a traffic citation following a crash.

57.     Examples regarding Tampa police officer attempts to increase other driver's insurance rates and arbitrarily selecting "at fault" drivers include:

a)  In December 1999, Officer Bowden investigated a minor crash.  He told the woman driver that he did not know who caused the accident, but that he was "required" to write a citation.  He then told the woman that he was selecting her as the "recipient" and subsequently equivocated about which citation to write.  His crash report omits pertinent information that would call into question whether the woman caused the minor accident.  The other driver used the police reporting to collect for damages from the woman's insurance company.   The woman did not know a crash report was written.

b)  In 2001, a driver slowed and was hit in the rear.  The investigating Tampa officer cited the driver in the forward car for Careless Driving, and documented on the citation and crash report that this driver slowed when he observed a friend.  Although the cited driver told the officer that no one in either car made any such allegation, the officer documented it nonetheless.   The driver immediately contacted his insurance company and reported the facts.  His insurance company advocated for him, and he eventually collected 80% of his damages from the other driver's insurance company.  His car was a total loss.  However, 20% of this loss was not funded due to the incorrect information provided by the police.  The

citation was dismissed in a traffic hearing when no one attended to testify against him.

c)  In 2003, a U.S. Air Force captain's car was hit in the rear after making a lane change.  The investigating Tampa officer falsely reported on the crash report that the captain sideswiped the other car.  The officer also drew a diagram that shows the captain's car sideswiping the other car, circumstances for which he would be at-fault.  The officer estimated the damage to each car as $50.  The citation was dismissed in a traffic hearing after the other driver testified that after the captain changed lanes, he sped up and struck the captain's car in the rear.  However, the captain did not know to contact his insurance company.  The other driver had used the police reporting to collect for damages from the captain's insurance company.  The captain estimates his insurance increased by approximately 40% upon renewal.

d)  Around 2000, a woman driver was hit while assessing whether it was clear to complete a left turn.  The passenger in the other car fled on foot.  The other driver subsequently made a cell phone call and stated concerns about returning to jail because he caused a crash while driving under the influence of marijuana.  The investigating Tampa officer refused to ask the driver about the marijuana use, even though the man smelled of marijuana.  In addition, the Tampa officer did not require the other driver to provide a license or proof of insurance.  The other driver claimed the car was not his and thus could not provide vehicle registration.  The officer wrote a citation to the woman.   The woman informed the young officer that she seemed inexperienced.  She requested the supervisor come to the

scene as she wanted to discuss the other driver's admission to using marijuana. The officer refused.  Subsequent to the crash, the other driver made an injury claim with the woman's insurance company.  In making a claim, he used a different name from that given to the officer.  The passenger who fled the crash scene also made an injury claim. Due to identity issues, these were not paid. However, the woman experienced a substantial premium increase after her insurance company paid to repair her new BMW.   If the officer assessed the other driver's statements about driving under the influence and required a license and proof of insurance, the insurance company may not have allocated 100% fault to the woman.  The woman believes the other driver was uninsured, and possibly did not have a driver's license due to the use of a fictitious name.   The Tampa police pension fund does not benefit from citations written to uninsured drivers or when fault is split between two drivers.  Neither the Tampa Police Department or the Department of Highway Safety and Motor Vehicles has been able to locate the related crash report.

58.      Tampa Police Department policies on writing citations in traffic crash investigations do not conform to Florida law.  Florida law requires officers to conduct a personal investigation and have reasonable and probable grounds to write a citation.  The Tampa Police written policy only requires an officer to contact the supervisor if the officer does not believe a citation should be written.  The Tampa police policy assists insurance companies in assessing crash responsibility for damages by requiring identification of an "at fault" driver even when there are no reasonable or probable grounds to issue a citation.  Tampa police officers Duncan, Bowden and Cragg, Corporal

24

Niemi, and Det. Murray openly discussed falsifying citations and/or crash reports. They were trained through the Tampa police education system. They do not appear to understand that false citations and associated reporting entries are illegal. They appear to believe that following a supervisor's directive or an administrative imperative absolves the officer of any responsibility for false reporting.

59.     The Tampa Police Department has increased its efforts to cite drivers for offenses which have a revenue enhancing and insurance premium increase effect. These include efforts to cite drivers for going 15 mph above the speed limit and ignoring research that concludes that citations (other than DUI and seatbelts) are not among the most effective means to reduce crashes, injuries and fatalities. Rather roadway improvements in particular adding traffic signals, or in the interim requiring officers to become highly visible. Instead Tampa officers hide and operate speed traps to maximize the number of citations written. 65 percent more traffic citations were written from February to April, 2004 than in the same period last year.

60.     The City of Tampa has also announced actions designed to increase the number of citations issued.

### The Pension Fund Connection

61.     Pursuant to Florida Statute § 185.03, the Tampa City Police Department has established a "Municipal Police Retirement Fund" plan.

62.     Florida Statute § 185.07 provides for the creation and maintenance of the Tampa Pension Fund. One of the major sources of the fund is a .85% excise tax provided by the Statute as follows:

(1)     The municipal police officers' retirement trust fund in each municipality described in s. 185.03 shall be created and maintained in the following manner:

(a)     By the net proceeds of the .85-percent excise tax which may be imposed by the respective cities and towns upon certain casualty insurance companies on their gross receipts of premiums from holders of policies, which policies cover property within the corporate limits of such municipalities, as is hereinafter expressly authorized.

63.     Florida Statute § 185.08 authorizes the City of Tampa to impose on each and every insurance company an excise tax amounting to .85% on the gross amount of receipts of premiums on all premiums collected on casualty insurance within it.

64.     The statute provides that the excise tax be paid on premiums for the period commencing July 1 of each year.   The City of Tampa has passed and enforced ordinances providing for the payment of tax proceeds into the pension funds.

65.     The City of Tampa itself as a Florida Statute § 185.105 municipality does not collect the tax directly.  The monies from the excise tax on the premiums are placed into the police and firefighters premium trust fund, a state fund managed by the Division of Retirement of the Department of Management of Florida State agency.

66.     Pursuant to Florida Statute § 185.09, each and every casualty insurer sends the excise tax collected on premiums to the Florida Department of Revenue.  In turn, the Florida Department of Revenue transfers the monies collected to the police and firefighters premium tax trust fund.  The Florida Department of Revenue is required to keep a separate account of all monies collected for each municipality.  On or before July 1 of every year the amount of money collected in the police and firefighters premium tax trust fund is reported and specifies municipalities to which the monies are to be paid and the net amount to be paid.

67.     Pursuant to the statute, the funds for the police and firefighters premium tax trust fund are forwarded to every municipality in the plan including the City of Tampa.  Florida Statute § 185.11 requires that the City of Tampa deposit a portion of the money in an account managed by a Board of Trustees who administers the Tampa Police Pension Fund.

68.     Approximately $2.2 million was transferred for the Tampa Police Pension fund for each of the years 1997, 1998, 1999 and 2000.  $2.55 million was transferred for 2001 and over $2.76 million was transferred for 2002.   In 2003, premium tax distributions were 3.09 million.  This is a 41% increase since 2000, the first year following the "extra benefits" legislation.  A lag occurs between the time a citation is written and the insurance increase occurs.  For example, the Orban crash and citation occurred in March 2000 and the premium did not increase until April 2001.  The increase was scheduled to continue to April 2004.

69.     The 0.85% premium tax results in the Tampa police pension receiving one dollar for every $117.65 Tampa residents pay for casualty insurance.

70.     Given this financing scheme of providing a .85%  excise  tax on the premiums of casualty insurance policies, the higher the amount of premiums, the more excise taxes in gross amount is generated for the Pension Fund.  By causing the driving record entries of Tampa residents to be worse, by creating false permanent records of crashes, and by increasing the number of claims filed, Tampa police increases the insurance premium increases.

71.     Police officers and administrators benefit from the premium tax on casualty insurance that accrues to the Tampa police pension fund.   As premium tax

revenues increase, the Tampa employee contribution rate to the pension plan is reduced as is the City's contribution.

72.     Due to the premium tax, the Tampa Police Department had a direct financial interest in precluding Dr. Orban from having the citation dismissed.  Based on the terms filed with the State of Florida, once the citation is dismissed, the Kemper-Lumberman's Mutual insurance company cannot charge the surcharge, which reduces total premium tax revenues collected by the Tampa Police Pension Fund.

73.     Tampa police administrators and officers personally benefit from an increase in automobile insurance premiums.  The increased premium tax revenues allow for reducing employee contributions to the pension plan.  This increases take-home income.  Tampa police administrators achieve the greatest benefit. There is an obvious conflict of interest inherent in traffic citation quotas relative to the premium tax revenues, which ultimately benefit individual police officers and administrators, as well as reduce the city's financial commitments to the police pension fund.

74.     In 2004, the City of Tampa requested legislative approval to increase the police pension multiplier from 2.5 to 3.15 and permit 300 annual overtime hours to be pensionable.  The legislation was approved.  Chapter 185 premium tax revenues are identified as one funding source for the expanded benefit, along with increased city and employee contributions.  Thus, city and police administrators anticipate increased premium tax revenues, which occur from Tampa residents paying higher  automobile insurance premiums.  This is accomplished, in part, by police administrators increasing traffic citation quotas and requirements such as writing traffic citations following automobile accidents even though reasonable and probable grounds do not exist to do so.

75.     Tampa Police officers wrote 65 percent more traffic citations from February to April 2004 in comparison with the same time period last year.  The additional citations will increase Chapter 185 revenues by increasing insurance premiums.  This is consistent with their plan to increase Chapter 185 revenues to assist in funding the enhanced police pension benefits, from which the police chief personally benefits.

76.     Despite significant salary increases, Sgt. Bennett, Det. Murray, and Officer Bowden each paid less in employee contributions to the police pension in 2002 than in 1999.

### Performance Appraisal and the Policy

77.     Tampa police officers are rated down on annual evaluations in traffic law enforcement if they do not write enough traffic citations.  Officers can be terminated after several years of unsatisfactory performance in a category such as traffic law enforcement.

78.     As an example, Officer Bowden's 2003 annual evaluation rated him "below expectation" in traffic law enforcement despite writing 74 citations.  The goal given to him for the upcoming year is to "increase his traffic law enforcement activity" and "set time aside for this."  An attachment to his evaluation provides a remedial plan for traffic law enforcement.  Officer Bowden's improvement will be measured by the number of traffic citations written.

79.     Tampa Police officers are encouraged to find out from fellow officers how many citations they are writing so that they can decide how many they should write in order to obtain a desired evaluation.

80.     The Tampa Police Department has a *de facto* quota system for citations enforced through the appraisal system.

81.     Based on policy, officers are formally prohibited from publicly making statements about the police department or its policies, such as the requirement to fabricate citations following crashes or the traffic citation quota.  For this reason, officers provide Dr. Orban with off-the-record statements and criticisms of the police department and its policies, but fear retribution if formally criticizing the department or policies.

82.     All conditions precedent to this action have been performed or excused.

## COUNT I
### (Malicious Prosecution under 42 U.S.C. § 1983 4th Amendment Detention)

83.     Plaintiff hereby realleges paragraphs 1 through 82 as though more fully set forth herein.

84.     Pursuant to the policies, practices and customs set forth above, Officers Bowden and Duncan acting as agents and officers of the City of Tampa unreasonably detained Dr. Orban and issued a traffic citation to her without legal cause or probable cause.

85.     This citation was issued with legal malice.

86.     The dismissal of Dr. Orban's citation on January 9, 2002 cleared her of legal responsibility from careless driving and was a bona fide termination of all charges against her.

87.     The defendants conduct set forth above violated the Plaintiff's rights to be free from unreasonable seizure under the Fourth and Fourteenth Amendments to the United States Constitution.

88.     As a proximate result of the aforementioned actions of the defendant, Dr. Orban was unreasonably detained and seized, seized pending hearing, and wrongfully

charged and prosecuted for the traffic offense of careless driving.  In addition, she suffered violations of her constitutional rights; financial expense of her legal defense in traffic court; emotional distress; mental anguish; resulting pain, suffering and loss of the capacity for the enjoyment of life; an undeserved public record of a traffic charge against her, increased insurance premiums, legal fees and costs.

## COUNT II
### (Malicious Prosecution under 42 U.S.C. § 1983- Denial of Procedural Due Process)

89.     Plaintiff hereby realleges paragraphs 1 through  82 and 84 through 88 as though more fully set forth herein:

90.     The State of Florida does not have an adequate remedy to redress the conduct alleged in that under Florida law the City of Tampa cannot be sued for  a malicious prosecution of its officers even though it is proximately caused by its policies, practices and customs.

## COUNT III
### (Malicious prosecution under 42 U.S.C. § 1983- Denial of procedural due process- *Zinermon*)

91.     Plaintiff hereby realleges paragraphs 1 through 82 and 84 through 88 as though more fully set forth herein:

92.     Notwithstanding any state remedies which may be alleged to exist, the defendant City of Tampa's policies, practices and customs created a risk of deprivation of the plaintiff's liberty or property.  That deprivation was foreseeable to the defendant.  The defendant could have reduced the risk either through additional pre-deprivation safeguards or by limiting its discretion in implementing established procedures and the defendants were authorized to implement the requisite safeguards.

## COUNT IV

93      Plaintiff hereby realleges paragraphs 1 through 82 as though more fully set forth herein.

94      The Defendant violated the Plaintiff's right to due process of law guaranteed by the United States Constitution.

95      As a proximate result of the aforementioned actions of the defendants, Dr. Orban was unreasonably detained and seized, seized pending hearing, and wrongfully charged and prosecuted for the traffic offense of careless driving.   In addition, she suffered violations of her constitutional rights; financial expense of her legal defense in traffic court; emotional distress; mental anguish; resulting pain, suffering and loss of the capacity for the enjoyment of life; an undeserved public record of a traffic charge against her, increased insurance premiums, legal fees and costs.

### Relief Sought for Counts I through IV

### Declaratory Relief Allegations

96.      An actual controversy exists between the Plaintiff and Defendants as to whether Defendants' policies, practices and customs in to issuing traffic citations and traffic crash reports and presenting traffic citation without reasonable and probable grounds for the purpose of raising revenue for the Police Pension Fund violates the Plaintiff's rights under the Fourth and Fourteenth Amendments, of the United States Constitution.

97.      There is a real and immediate threat to the Plaintiff that the policies, practices and customs of the Tampa City Police will result in Dr. Orban being issued a

citation for relief as to issue an alleged traffic offense even if there are no reasonable and probable grounds.

98.     The controversy between the parties affects not only the Plaintiff and Defendant, but every other person who can be ticketed by the Tampa City Police for traffic offenses for which there is no reasonable and probable grounds.

99.     Plaintiff is informed and reasonably believes that there are thousands of other persons who can be ticketed without reasonable and probable grounds for the purpose of funding the Tampa Police Pension Fund, and a declaration by this court will avoid this issue being raised in other cases.

100.    Unless a court issues a declaration of rights, the parties will not know whether Defendants' policies and practices are unconstitutional and there will continue to be disputes and controversies concerning this issue.

**WHEREFORE** Plaintiff, Dr. Orban, demands and judgment against defendant for all compensatory damages allowable at law including attorney's fees pursuant to 42 U.S.C. § 1988 and costs and any other relief this Court deems just.  The Plaintiff further requests a declaration that:

1.      Defendant's policies, practices and customs to write a traffic citation without reasonable and probable grounds are unconstitutional and otherwise illegal.

2.      The issuance of citations after it has been determined that issuance of a citation is inappropriate is unconstitutional and otherwise illegal.

3.      A practice of allowing a supervisor to override a determination of an officer investigating at the scene is unconstitutional and otherwise illegal in the absence

of facts showing the supervisor had reasonable and probable grounds to cause a citation to issue.

4.     Placing known erroneous entries in a citation or crash report to supply a rationale for the citation or conclusions of the crash report is unconstitutional and otherwise illegal.

5.     The crash report applicable to the March 27, 2000 incident contains factual errors as set forth above.

6.     Traffic court use of crash reports to contradict the testimony of witnesses without providing said report to the parties and without appearance and authentication by the police officer is unconstitutional and otherwise illegal.

7.     A *de facto* quota system for traffic citations is unconstitutional and otherwise illegal.

8.     A system which causes citations to be issued to generate funds for the Police Pension Fund is unconstitutional and otherwise illegal.

9.     The practice of reducing employee or city contributions to the pension fund based upon premium tax revenues received is unconstitutional and otherwise illegal.

10.    The practice of having insurance companies contribute to police pension funds based upon a percentage of premiums collected is unconstitutional and otherwise illegal.

11.    Also the practice and policy of keeping police officers away from court and not honoring subpoenas is unconstitutional and otherwise illegal.

12.    Refusing to give information to citizens that is required to given so the citizen can protest citations is unconstitutional and otherwise illegal.

**Injunctive Relief**

101.    Unless these practices are enjoined the Plaintiff will suffer irreparable

harm.

Plaintiff requests the court enjoin the practices set forth above.

**DEMAND FOR TRIAL BY JURY**

Plaintiff demands trial by jury of all issues so triable.


Respectfully submitted,

s/ Joseph D. Magri
Joseph D. Magri


CERTIFICATE OF SERVICE


I HEREBY CERTIFY that on September 23th, 2005 I electronically filed the
foregoing with the Clerk of the Court using the CM/ECF system which will send a Notice
of Electronic Filing to the following:  John Makholm, Esquire, 696 First Avenue North,
Suite 205, St. Petersburg, Florida 33701 and Ursula Richardson, Esquire, City Attorney's
Office, 315 East Kennedy Boulevard, Fifth Floor, Tampa, Florida 33602.


S/Joseph D. Magri
Joseph D. Magri
Florida Bat Number 0814490
Attorney for Plaintiff Barbara Orban
Merkle & Magri, P.A.
550 North Reo Street, Suite 301
Tampa, Florida 33609
Tel.: (813) 281-9000
Fax.: (813) 28102223
jmagri@merklemagri.com